UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES ALBERT TRANKLE<br><br>(a/k/a "John Davis"),<br><br>Defendant. | Case No. 21-CR-00675-TNM |

UNITED STATES'S MEMORANDUM IN
SUPPORT OF PRETRIAL DETENTION

After law enforcement searched the defendant's residence in August 2018 and interviewed him about his fraud scheme, the defendant left the area; he changed his name to "John Davis" and began living with no fixed address.  He was arrested in Las Vegas, Nevada, last month where he was living completely off the grid with no property, no vehicle, and no credit accounts in his own name.  The defendant is a serious flight risk and, accordingly, the Court should order that the defendant be detained pursuant to 18 U.S.C. § 3142 pending further proceedings in this matter.

BACKGROUND

From at least 2013 until 2018, defendant James Trankle was the primary architect of a scheme that was both deceitful and depraved.  In short, the defendant created fake charities with seemingly sympathetic names—for example, the "National Breast Cancer Awareness Fund," the "Children's Leukemia of America Fund," and the "Disabled and Paralyzed Veterans Fund"—and registered those organizations with the District of Columbia Department of Consumer and

Regulatory Affairs ("DCRA").  (Indic.[1] ¶¶ 1, 3, and 8(1).)  The defendant then created and mailed solicitations to thousands of victims across the country seeking contributions to these organizations.  (Indict. ¶ 4.)  The defendant's solicitations included numerous false promises and assurances intended to dupe victims into sending contributions. (Indic. ¶ 7.)  For example, the defendant's solicitations falsely told victims that "100% of your donation goes directly" to charitable purposes.  (Ex.[2] 1.)  During the course of the scheme, hundreds of victims responded by mailing personal checks to the defendant's organizations believing that they were donating to legitimate philanthropic causes.  (Indict. ¶¶ 8-4, 8-5.)  The defendant and another conspirator then deposited the victims' donation checks into bank accounts that they controlled.  (Indict. ¶ 8(7).)  However, in reality, the defendants' putative "charities" performed none of the charitable work described in their solicitations to victims, nor did the "charities" disburse any significant funds for charitable purposes.  (Indict. ¶ 8(12).)  The government's analysis of those accounts indicates that the conspirators obtained more than $40,000 from more than 1,600 victims who falsely believed that they were giving money to legitimate organizations.

But the defendant's scheme did not stop there.  After the defendant and a coconspirator had collected the victims' initial donation checks, the conspirators then used information from those donation checks—like the victims' name, address, bank account number, and bank routing number—to create hundreds of unauthorized counterfeit checks drawn against the victims' bank accounts, which they deposited into other accounts that the conspirators controlled at five different banks.  (Indict. ¶¶ 8(9), 8(10).)  In total, the conspirators deposited more than 600 counterfeit checks with a total value over $140,000 into accounts that they controlled.  (Indict.

---

[1] "Indic." refers to the Indictment returned] by the Grand Jury on November 16, 2021, at the stated paragraph. "8(#)" refers to a specific Manner and Means from paragraph 8 of the Indictment at the stated number (#).

[2] "Ex." refers to the exhibits to this Memorandum.

¶¶ 10, 12, 14, 16, 18.)  Virtually all of the proceeds of the scheme were dissipated through ATM withdrawals and financial transactions disconnected from any charitable purpose.

## APPLICABLE LEGAL PRINCIPLES

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).  The Bail Reform Act ("BRA") requires the judicial officer to assess various factors, as described below, before releasing or detaining a defendant. 18 U.S.C. § 3142(g).  The Court shall "take into account the available information concerning "(1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

## ARGUMENT

The defendant in this case is charged only with non-violent offenses.  Accordingly, the government seeks pretrial detention because the defendant poses a serious flight risk.  As discussed further below, with the exception of dangerousness, all of the other statutory factors in 18 U.S.C. § 3142(g) weigh in favor of the pretrial detention of the defendant.  The crimes charged in the Indictment are serious, the evidence against the defendant is compelling, and the defendant simply cannot be relied upon to appear before the Court for future proceedings.

### I. The Nature and Circumstances of the Offense Charged

Without question, the offenses described in the Indictment are serious and carry substantial penalties.  The grand jury has charged the defendant with one count of conspiracy to

3

commit mail fraud and bank fraud; five counts of bank fraud, one for each of the financial institutions that the conspirators defrauded by depositing counterfeit checks; and four counts of aggravated identity theft based on specific counterfeit checks that the conspirators deposited at banks located in Washington, D.C.  If convicted on all counts and sentenced consecutively, the defendant could spend the remainder of his life in the custody of the Bureau of Prisons.

If convicted at trial of only one count of conspiracy under 18 U.S.C. § 1349, a conservative assessment of the defendant's exposure under the U.S. Sentencing Guidelines would be as follows:

| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1) | Loss Amount: $180,000 | +10 |
| U.S.S.G. § 2B1.1(b)(2)(A) | Mass marketing (1,600 victims) | +2 |
| U.S.S.G. § 2B1.1(b)(9) | Misrepresentation the defendant acted on behalf of a charity | +2 |
| U.S.S.G. § 2B1.1(b)(10) | Sophisticated means | +2 |
| U.S.S.G. § 3B1.1(c) | Organizer / leader | +2 |
|  | TOTAL OFFENSE SCORE: | 25 |

With a total offense score of 25 and assuming the defendant has no criminal history points[3] the likely range for a guideline-compliant sentence would be 57 to 71 months' incarceration (Zone D).  Additionally, the four counts of aggravated identity theft each carry a mandatory two-year period of incarceration which must be served consecutive to any other sentence.  18 U.S.C. § 1028A(b).  These substantial penalties weigh in favor of detention.

---

[3] The government believes that the defendant may have at least five criminal convictions which may change his criminal history category: Telephone-Unlawful Use (MD, 1986); Burglary (MD, 1986); Alcohol Bev Intoxicated (MD, 1988); Felony False Pretenses (NC, 2006); Simple worthless checks (NC, 2015)

## II.     The Weight of the Evidence

The government's evidence against the defendant is compelling. During its investigation, the government has obtained records from victims, financial institutions, government agencies, and the defendant himself during a search warrant executed at his residence in August 2018. Law enforcement has interviewed more than twenty victims.

The evidence associated with Victim 1 provides a forceful example of the evidence against the defendant. Victim 1 has explained to the government that he received a solicitation from the Children's Leukemia of America Foundation ("CLAF") in approximately 2015. (Ex. 1.) The solicitation promised that donations to CLAF would be "fully 100% Tax Deductible" and that "100% of [his] donation" would go "directly to Children's Leukemia of America Foundation" in order to "benefit members, non members, and the community with resources[.]" (Ex. 1.) The solicitation suggested that Victim 1 should make a $35 donation. (Ex. 1.) Victim 1 responded to the solicitation by sending a personal check in the amount of $35 and a response form to the address on the solicitation: "1300 Pennsylvania Avenue, N.W., Bldg. 190, Ste. 625, Washington, D.C." (Ex. 1.) Victim 1 kept a copy of the solicitation and made a handwritten notation that he had sent a $35 check in response on July 15, 2015. (Ex. 1.) Law enforcement found a copy of Victim 1's donation check and response form in the defendant's residence when executing a search warrant in August 2018. (Ex. 2.)

Law enforcement also obtained a copy of a counterfeit check purportedly authorized from BB&T which had been deposited into a bank account controlled by the conspirators. (Ex. 3.) The counterfeit check purported to be number "3442" from Victim 1's checking account. (Ex. 3.) This check was never authorized by Victim 1—let alone, signed by him. (Ex. 3.) Nonetheless, the bottom line of the check includes the same bank account and routing number that Victim 1 used in his initial donation check. (Ex. 3.) The fake check makes reference to an

5

"indemnification agreement" that Victim 1 never signed.  (Ex. 3.)  And the bank has no record of an "indemnification agreement" ever being provided to them by the scammers.  (Ex. 3.)

There should be little doubt that the defendant operated and controlled the charity that sent the solicitation to Victim 1 and made a counterfeit of Victim's 1 donation check.  Records obtained from the DCRA show that "Children's Leukemia of America of Foundation" is a registered trade name for another organization called Good Charity Church, Inc.  (Ex. 4.)  That "church" is a corporation registered in the District of Columbia with an address located at "1300 Pennsylvania Ave. NW, Bldg 190 STE 202."  (Ex. 5.)  The registered agent for Good Charity Church, Inc., is defendant James Trankle.  (Ex. 5.)  Records obtained by law enforcement show that the address for Good Charity Church, Inc., is a post office box in Washington, D.C., which defendant James Trankle personally obtained.  (Ex. 6.)  At the time that he registered for that post office box, defendant James Trankle provided a copy of his U.S. passport and Maryland driver's license at the time of registration.  (Ex. 6.)  And, when law enforcement executed a search warrant at the defendant's home office in August 2018, an inspector from the U.S. Postal Inspection Service recovered the physical key for that post office box.  (Ex. 7.)

Law enforcement has interviewed over twenty victims who have recalled being defrauded in the same manner as Victim 1.  Indeed, those victims described receiving solicitations from eight other organizations that the defendant registered with the DCRA: "Disabled and Paralyzed Veterans Foundation," "Disabled and Paralyzed Veterans Fund," "National Breast Cancer Awareness Foundation," "National Breast Cancer Awareness Fund," "Children's Leukemia of America Fund," "Capitol Hill Advocate," "Restaurant Buyers Club," and "Police Crimeline."  (Ex. 8.)  Law enforcement recovered numerous marketing materials,

mailings, and financial records for all of these organizations when searching the defendant's residence in August 2018.[4]

In an interview with law enforcement on the day of the search, Trankle admitted that he controlled "non-profit organizations" but denied that he operated "charities" (Ex. 10)—even though records for Trankle's charities were plainly recovered inside of Trankle's home.  Further, Trankle admitted to mailing solicitations on behalf of one of the "non-profit organizations" that he controlled, Police Crimeline. (Ex. 10 at 2.)

Finally, the government has obtained bank surveillance footage which shows defendant James Trankle depositing counterfeit checks into bank accounts that the conspirators controlled.  For example, the following photographic still shows defendant Trankle depositing counterfeit checks drawn on the accounts of D.G., G.G., W.X.D., and X.Y.L. at a SunTrust branch in Washington, D.C., on November 13, 2017:



These counterfeit check deposits support two of the counts of aggravated identity theft that the grand jury charged in Counts 7 and 8 of the indictment.  (Indict. ¶ 20.)

On balance, there should be little doubt that the defendant participated in the scheme described in the indictment.  He controlled the charities and non-profit organizations.  He mailed the solicitations.  He opened and controlled the Washington, D.C., post office box used by the

---

[4] Several samples of these materials recovered from the defendant's home office appear at Exhibit 9 hereto.

"charities." And the defendant deposited the proceeds into accounts that the conspirators controlled. Accordingly, the strength of the evidence weighs in favor of detention in this case.

### III.     The History and Characteristics of the Defendant

The third factor in section 3142(g) considers, among others, a detainee's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, [and] criminal history" as well as the detainee's "record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3). These considerations further weigh in favor of detention.

The defendant has no ties to the District of Columbia, and no meaningful connection to any other community. In August 2018, law enforcement agents searched the defendant's residence in suburban Maryland. At some point after that search, the defendant moved out of the Washington, D.C. area and has had no fixed address ever since. He owns no property, not even a vehicle, in his own name. The government has identified no active credit accounts that he controls. Through a court records search, the government learned that defendant Trankle legally changed his name to "John Davis" in California during October 2019. (Ex. 11.) However, the address that Trankle provided to the Superior Court for Los Angeles County in his name change application—3705 West Chico Boulevard, #1596, Los Angeles California—was for a private mail receiving company, not an actual residential address.[5]

On June 14, 2022, the date of Trankle's arrest last month, Trankle was sleeping on the grounds of the University of Nevada-Las Vegas campus. Campus police checked Trankle's identification, and learned about the arrest warrant for the defendant issued by this court.

---

[5] *See* The Virtual Domicile, https://www.virtualdomicile.com/index.htm (accessed July 10, 2022).

Thereafter, Trankle was taken into custody on the federal warrant. At that time, law enforcement found two separate identification cards for Trankle. (Ex. 12.) One of those identification was a Maryland driver's license which had expired in 2016. The other identification card issued by the State of California showed Trankle's picture with the name "John Davis" and the address for the mail forwarding service described above, i.e., not an actual residence. The government submits it would be nearly impossible to fashion conditions of release that would allow the defendant to be under court supervision from this last known "address"—let alone assure that the defendant can travel from California for court appearances.

Additionally, the defendant appears to have harbored bizarre beliefs about the legal system and nonsensical ideations which make it difficult to trust any promise he would make to return to future proceedings in this matter. For example, when Trankle participated in a voluntary interview with law enforcement in August 2018, Trankle stated he was an "investigative reporter…working on a report involving the Secretary of the Treasury, Steven Mnuchin" because an associate of Mnuchin named Ryan Kavanaugh "has a connection to the Fraternal Order of Police." (Ex. 10 at 1.) Trankle also claimed that "he was planning to file a RICO Act case in Greenbelt Federal Court" and asked whether law enforcement's search warrant would allow them "to install hacking programs on his computers." (Ex. 10 at 1-2.) Trankle also stated that he believed the investigative firm Black Cube had "likely installed hacking software on his computer" because a book had been stolen from him and given to "Harvey Weinstein and other movie producers to write movie plots." (Ex. 10 at 2.) Equally concerning, when law enforcement searched defendant Trankle's computer pursuant to a search warrant, investigators identified a file named "Murder list against me" in which Trankle apparently intended to warn no less than fifty-five individuals and organizations as follows:

9

"None of you will drug me or try to kill me again … I have no choice but to take all of you out. … Expect the marshals to come seize everything all of you have. Everyone else will be sued." (Ex. 13.)

The very nature of the crimes in the indictment counsel that the defendant cannot be trusted to adhere to his promises. Indeed, the core of the government's case involves lies told by the defendant—literally, thousands of them. The defendant lied to victims who thought they were giving money to legitimate organizations. And the defendant then lied repeatedly to financial institutions by claiming the victims had authorized counterfeit checks. When these considerations are coupled with the defendant's lack of a verified address, phone number, and other community ties, even electronic monitoring or heightened supervision cannot guarantee the defendant's presence at future proceedings. *See also United States v. Ali*, 793 F. Supp. 2d 386, 392 (D.D.C. 2011) (finding that electronic monitoring would give a defendant with no ties to the United States "ample lead time if he wished to flee the country"); *United States v. Lee*, 195 F. Supp.3d 120, 132 (D.D.C. 2016) ("[W]hile defendant would be subject to 24-hour GPS monitoring by a computer, there is no human being monitoring that data, and so Pretrial Services would only become aware of an infraction by the defendant on the next business day.")

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court should order that the defendant be detained pending further proceedings in this matter.

                                  Respectfully submitted,

                                  MATTHEW M. GRAVES
                                United States Attorney

By: _____
       JOHN W. BORCHERT (Bar No. 472824)
       Assistant United States Attorney
       Fraud, Public Corruption & Civil Rights Section
       555 Fourth Street, NW
       Washington, D.C.  20530
       (202) 252-7679
       john.borchert@usdoj.gov

July 12, 2022

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July 2022, I caused a copy of the foregoing to be served on counsel for the defendant.

                                                JOHN W. BORCHERT
                                                Assistant United States Attorney