**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIM NO. 21-CR-675** |
| **JAMES TRANKLE** | ) | **Judge: McFadden** |
| | ) | **Sentencing: 12/1/23** |

**DEFENDANT JAMES TRANKLE'S
MEMORANDUM IN AID OF SENTENCING**

COMES NOW James Trankle, by and through counsel, and submits

the following memorandum in aid of sentencing.

**Background**

On November 16, 2021, James Trankle was indicted on a ten-count

indictment. He was charged with 1) Count One – Conspiracy to Commit Mail

Fraud and Bank Fraud; 2) Counts Two through Six – Bank Fraud; and 3) Counts

Seven through Ten, Aggravated Identity Theft. The government alleged that Mr.

Trankle, along with a co-conspirator Stephen Sibert, created a scheme whereby

they created and mailed solicitations for donations from his church, Good Charity

Church, Inc., under names of various charities the church was operating as "doing

business as" or "D/B/A" organizations. Good Charity Church, Inc., was registered

in the District of Columbia. These names of these various charities had been

1

properly registered with the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) under alternate names for Good Charity Church, Inc., as D/B/A's. These D/B/A names included names such as the "Disabled and Paralyzed Veterans Foundation;" and "National Breast Cancer Awareness Foundation;"

The letters soliciting donations included relevant facts and figures regarding the cause to help raise awareness and would also indicate that the donation provided was also for the "general welfare of the organization." The letters also had language that indicated that "100% of your donations goes directly to the Foundation." The letters also indicated that any donations were tax deductible. The bottom part of the letter was a portion that was to be returned with the payment. The portion that was returned also included a "Pledge Amount" with words like "Pledge: Monthly Start Jan Recur." That portion was meant to indicate that this was a pledge that would be recurring on a monthly basis beginning in January. The letter would be addressed to a post office box in Washington, DC, that was registered to Mr. Trankle's church. After a pledge was received and the check was cashed, in some instances, the defendant would create a remotely created check using the bank information provided from the original check in the amount of the pledge. According to the evidence, those checks had been created

2

and printed by Mr. Trankle via computer and printer, known more commonly as a remotely created check. Then, those checks would then be cashed by Mr. Trankle. The checks were deposited in several different accounts being used for this purpose. The government asserted that those remotely created checks had been unauthorized by the original donor.   This represented the basis for the conspiracy of Count 1 and the bank fraud Counts 2 through 6.

The government also charged, in Counts 7 through 10, that Mr. Trankle committed identity theft on four separate occasions. The government alleged that Mr. Trankle possessed the full name and bank account information of those individuals without lawful authority.

Immediately prior to the trial commencing on May 9, 2023, the government dismissed Counts 7 and 10 of the indictment, which were two charges of Aggravated Identity Theft. The jury trial commenced as to the remaining counts. At the conclusion of the presentation of the government's evidence on May 10, 2023, Mr. Trankle made a motion for judgment of acquittal, including specific arguments pertaining to Counts 8 and 9, the remaining Aggravated Identity Theft counts. The court reserved judgment, and the court adjourned for the day. The next day, on May 11, 2023, the government orally moved to dismiss counts 8 and 9, which was granted. On May 15, 2023, the jury returned a verdict of guilty on the

3

remaining 6 counts, namely Count 1 – Conspiracy; and Count 2 through 6 - Bank Fraud. A Presentence Report ("PSR") was ordered, and a sentencing date was scheduled for August 29, 2023. After motions to continue the sentencing were granted, the sentencing date was set for December 1, 2023.

## ARGUMENT

### A.   Statutory Penalty

Count 1, Conspiracy to Commit Mail Fraud and Bank Fraud, 18 U.S.C. § 1349, carries a maximum sentence of twenty (20) years of imprisonment and/or a $250,000 fine. Counts 2-6, Bank Fraud, 18 U.S.C. § 1344(2), each carry a maximum sentence of thirty (30) years imprisonment and/or a $1,000,000 fine.

### B.  Sentencing Guideline Calculations and Departures

James Trankle does not disagree with the criminal history calculation of Criminal History Score I made in the PSR. However, the defendant objects to certain adjustments to the offense level in the Presentence Report. However, Mr. Trankle does agree that the Base Level Offense of 7 is correct.

1.  <u>USSG § 2B1.1(b)(1)(F) was improperly calculated.</u>

Defendant Janes Trankle has multiple objections to the calculation to make as to the application of USSG § 2B1.1(b)(1)(F). As it currently stands, the PSR indicates

a loss of more than $150,000 but less than $250,000, thus causing an increase of 10

levels. PSR at ¶ 34.

A. Trial evidence victims

During the trial, the government only provided the testimony of a handful of

people. These are the only individuals that were able to state that they were in fact

defrauded. All remaining "fraudulent" check loss amounts are wholly based upon

conjecture and there is not sufficient evidence to show that the individuals who had

their checks deposited were in fact defrauded. Therefore, when combining only the

losses attributed to the testifying witnesses, the loss exceeded is under $6,500 and

there should be no increase to the base level at all due to the amount of loss.

B. Expert report

In preparation for sentencing, the defense retained the services of Mike

Dashiell, a forensic accountant.[1] His report is attached to this memorandum and

incorporated herein as Exhibit A. Mr. Dashiell, who fully reviewed all the bank

accounts in this matter, has determined a different loss amount then that provided by

the government. Based on his analysis and report, the defense makes its objections

as follows and suggests that one of the following numbers should be the finding:

1) According to his report, the loss amount in all six accounts that were

---

1 Mr. Dashiell has made himself available to testify at the time of sentencing.

submitted in this case was $135,903.00. Therefore, according to the guidelines, there should be an increase of 8 levels, as opposed to the 10 levels suggested in the PSR.

2) The government presented six different accounts in the trial. However, the banks referenced in Counts 2 through 6 only refer to five bank accounts (one as to each count). Accordingly, there is no allegation count of fraud as to the SunTrust account which was included in the calculated amounts. Therefore, the loss amount, when considering only the five bank accounts referenced in the indictment (as well as Mr. Dasheill's calculations), leaves a total of $133,418, which also causes an increase of 8 levels.

3) After preparation of the final report prepared by Mr. Dashiell (Exhibit A), undersigned counsel conferred with Mr. Dashiell in preparation for the sentencing. In that discussion, the defense became aware that several of the accounts had "commingled" account funds. It appears that the accounts and calculations included checks that were made paid to the order of other businesses owned by Mr. Trankle and not with regard to the charity fraud alleged. For example, of the checks that were included in the calculation for First National, of the $77,270.00 that

6

were donor deposits, it appears that almost every check that was deposited were made paid to the order of Restaurant Buyers Club, or RBC. RBC was a separate 501(c)(6)[2] company and not a charity of any kind, nor was it involved in any of the solicitations that made up the bank fraud charges. The RBC provided a service to restaurants, which was their client base, and at no time has there been any suggestion or evidence by the government that RBC was presented as a charitable organization. Excluding these checks wholly unrelated to the charity fraud alleged would have a serious difference in the final calculations of loss.

For example, the First National account was the bank account at issue in Count 3. Mr. Dashiell reviewed all the checks that were deposited in that account. It appears that of all of the checks deposited in that account, only 2 of those checks totaling $50 were made to one of the "charitable D/B/A's" that are at issue in this case. All the remaining checks were made out to RBC which, again, was a 501(c)(6)

---

2  A 501(c)(6) is a tax-exempt organization, it is for "Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

and not for a charitable donation. If the court were only to consider the losses related to the charities and not to RBC, that would decrease the amount of loss by $46,035 less. Based upon this discovery, Mr. Dashiell is preparing an additional expedited review of the checks in all the accounts at the defense's request. The defense expects that this review will distinguish the checks that were intended for charity purposes with the ones that were for non-charity purposes.   Mr. Dashiell has indicated that he can provide that report by tomorrow. Accordingly, the defense will supplement this sentencing memorandum with that report once it has been received and will present a loss number based solely on the checks that are properly considered under the conspiracy in this case.

C. Credits against loss

Under the Application Notes for USSG § 2B1.1(b)(1)(F), Note 3(E)(i), the Guidelines provides that the loss shall be reduced by "fair market value of the.services rendered by the defendant,,,to the victim before the offense was detected." The defense would submit to the court that Mr. Trankle's work efforts by providing his work through his church should offset the loss amount, as his efforts were to support the mission of the organization as promised in the letter. Because of

the numerous hours included in the efforts of Mr. Trankle in stopping charity fraud, the fair market value of his services should offset the losses to the victims, since these efforts occurred before the offense was detected. Accordingly, the defense submits that this would create "a wash" and that there was no loss and there should not be an increase of any level.

    2.  USSG § 2B1.1(b)(2)(A) is not applicable.

Under USSG § 2B1.1(b)(2)(A), there is a 2-point level increase if there are 10 or more victims. During the trial, the government presented less than 10 victims to the jury. Furthermore, the government failed to show that there were any other potential "victims" who complained of the actions taken by Mr. Trankle in any other form. We do not know if those non-testifying "victims" indeed indicate that they were defrauded or even whether they complained to anyone. Arguably, as we did not see these victims, it is totally possible that they did understand the terms set out in the letter and agreed to them. Accordingly, this court should only take the evidence provided at trial and the testimony of the victims at trial. Thus, since there was no showing of 10 or more victims, there should not be any level increase. While the government has suggested that there were 1,600 victims who were defrauded, the government has failed to provide any supporting evidence of fraud of the individuals other than those they called at trial.

9

If indeed the government is depending upon the fact that there were 1,600 victims because there were 1,600 remotely created checks, that argument should fail for two reasons. First, the government has not provided any evidence that those alleged victims did indeed indicate they were defrauded and/or did not authorize the checks. Second, the government has not provided evidence that those checks were in fact made to one of the "charitable" organizations, as opposed to other entities with which Mr. Trankle was involved, such as the Restaurant Buyer's Club. Accordingly, the court should not increase Mr. Trankle's level by 2 points on that basis.

3. <u>USSG § 2B1.1(b)(9)(A) is not applicable.</u>

USSG § 2B1.1(b)(9)(A) provides that "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency," there should be a 2-level increase. This increase is not applicable either. As was adduced into evidence and was never disputed, Mr. Trankle was a minister for Good Charity Church, Inc., which was properly incorporated and registered in the District of Columbia. The government also provided evidence that Good Charity Church was properly registered in the District of Columbia for "doing business as" various entities. At no time has the government provided that Mr. Trankle's Church is not legitimate or not properly registered.

10

Under 26 U.S.C. 501(c)(3), the list of tax-exempt organizations includes:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes."

Furthermore, 26 U.S.C. 508(a) provides that

Except as provided in subsection (c), an organization organized after October 9, 1969, shall not be treated as an organization described in section 501(c)(3) -

**(1)** unless it has given notice to the Secretary in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of such status, or

**(2)** for any period before the giving of such notice, if such notice is given after the time prescribed by the Secretary by regulations for giving notice under this subsection.

Accordingly, under this code section, it would appear that a corporation would in the normal course have to apply for recognition as a 501(c)(3) corporation. However, there are **mandatory** exceptions to this rule later in the section which are addressed in 26 U.S.C. § 508. Sections (a) and (b) of

**(c)EXCEPTIONS**

**(1)MANDATORY EXCEPTIONS**

Subsections (a) and (b) shall not apply to—
**churches,** their integrated auxiliaries, and conventions or associations of churches[.] 26 U.S.C. § 508(c)(1)(emphasis added)

As such, Mr. Trankle's Good Charity Church, Inc., for all intents and purposes, has tax exempt status automatically without any need to apply. This argument is supported by <u>Ieyoub v. World Christian Church</u>, 649 So. 2d 771 (La. App. 1994).3  In <u>Ieyoub</u>, the court held that IRC § 508(c) provides that "churches, their integrated auxiliaries, and conventions or associations of churches ..." are granted automatic IRC § 501(c)(3) status, without the necessity of paperwork provided to the IRS. <u>Ieyoub</u> at 776. In this case, there has been no indication at any time that Good Charity Church, Inc. was not a church, and/or that Mr. Trankle was not a minister of that church. Accordingly, under the rules of the Internal Revenue Code, Good Charity Church, Inc. is tax exempt without needing to apply for tax-exempt status.

Given the fact that Good Charity Church was indeed a tax-exempt organization, it therefore means that the "D/B/A's it was operating under were also tax-exempt. USSG § 2B1.1(b)(9)(A) states that 2 points should be added if the offense involves a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency. This is not a situation of a fraud that was a noncharitable organization pretended to be a charitable organization. Instead, this is a fraud having to do with

---

3  A copy of that decision is attached hereto as Exhibit XX

representations made on the pledge requests. Mr. Trankle was not a for-profit organization pretending to be a charitable organization, which is what is called for under USSG § 2B1.1(b)(9)(A). Therefore no "misrepresentation" exists that would support a 2-level increase. Accordingly, this Honorable Court should not grant the 2-level increase under USSG § 2B1.1(b)(9)(A).

<u>USSG §2B1.1(b)(10) is not applicable.</u>

A 2-point increase is warranted if, under USSG §2B1.1(b)(10), the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. "Sophisticated means" is defined in that section "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG §2B1.1(b)(10) comment 9(c). In this case, Mr. Trankle's actions were not particularly complex. He mailed pledge requests through the U.S. Mail and cashed the checks on those that were returned. His use of a P.O. Box, as shown at trial, was not an uncommon procedure by charitable organizations requesting donations. These actions were not either "especially complex" or "especially intricate."   Accordingly, the 2-level increase should not be applied.

4. <u>USSG §3B1.1(c) is not applicable.</u>

A 2-level increase should not be applied under USSG §3B1.1(c) for being a manager. USSG §3B1.1(c) requires that "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." USSG §3B1.1(c) In this matter, Mr. Trankle worked along with Mr. Seibert, who, based upon testimony at trial, willingly offered his help. The two apparently worked in tandem, but Mr. Trankle was not managing the actions of Mr. Seibert. Thus, while they were working together neither took a greater role, albeit Mr. Trankle appears to have done a greater share of the work as alleged by the government. In fact, Mr. Seibert appears as the primary individual in several of the bank accounts in question. Accordingly, Mr. Trankle should be considered solely a participant alongside Mr. Seibert, and neither was managing the other, and a 2-point increase is unwarranted.

5. <u>USSG §4C1.1 is applicable and should apply.</u>

In addition, since this sentencing is occurring after November 1, 2023, Mr. Trankle is eligible for a 2-point reduction under § 4C1.1. Under 4C1.1, colloquially known as the "zero-point offender reduction," Mr. Trankle should receive 2 less points due to having zero points of Criminal History. 4C1.1 reads, in its entirety:

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:
(1) the defendant did not receive any criminal history points from Chapter Four, Part A;
(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
(3) the defendant did not use violence or credible threats of violence in connection with the offense;
(4) the offense did not result in death or serious bodily injury;
(5) the instant offense of conviction is not a sex offense;
(6) the defendant did not personally cause substantial financial hardship;
(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and
(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;
decrease the offense level determined under Chapters Two and Three by 2 levels.

Mr. Trankle meets all the criteria. At no time was there any indication that these loss amounts by these people caused "substantial" financial hardship, particularly since the loss amount was almost entirely either $50 or less per victim. Furthermore, to qualify, Mr. Trankle just needs a criminal history score of 0. The fact that Mr. Trankle has convictions that have lapsed and are therefore not scored

does not make him ineligible for the decrease – it appears the Guidelines do not make lapsed convictions a basis to deny the 2-level decrease. Accordingly, this Honorable Court should lower the offense level by 2 levels.

### C.   Statutory Sentencing Factors

As this court knows, in United States v. Booker, 543 U.S. 220, 264 (2005), the Supreme Court indicated that sentencing courts should "consult [the Sentencing]Guidelines and take them into account when sentencing." Booker further indicated that the purpose of the guidelines was to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'"*Booker*, 543 U.S. at 264 (quoting 28 U.S.C. § 991(b)(1)(B)).

Given the factors under 18 U.S.C. § 3553(a), this court should consider the following: (1) the nature and circumstances of the offense; (2) the defendant's history and characteristics; (3) the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment,affords adequate deterrence, protects the public, and provides the defendant with needed educational or vocational training and medical care; and (4) the need for the sentence to avoid unwarranted disparities among defendants with similar records convicted of similar conduct. *See* 18 U.S.C. §

3553(a).

## 1.   Nature and Circumstances of the Offenses

James Trankle is alleged to have taken small amounts of money from multiple victims over the course of just under six years. Each victim donated a small amount, usually less than $50, which may have been followed up by another similar amount via a remotely controlled check. Even using the government's loss numbers, which, as discussed above, are overstated, totaled approximately $185,000, which would work out to be about $32,000 yearly. This is hardly the amount that would suggest a lavish lifestyle.

As part of his efforts, Mr. Trankle needed to reinvest funds in this business, Mr. Trankle needed to spend money on envelopes, stamps, and the monthly rent for his office, all of which was considerable overhead. His goal was not to enrich himself. Quite the contrary, as a minister, he had taken a vow of poverty and was committed to it. He was homeless, did not own a car or property, and solely used a bicycle as his primary means of transportation. He slept in his office, as he had no other place to go. Indeed, when he was arrested, he was living on the streets.

His purpose for doing this was his mission and his life's work. As a

minister, he was accomplishing his mission goal of protecting God's money. His inspiration is a biblical one, where Jesus flipped the tables of the money changers in the temple.[4] His mission, and therefore his church's mission, is to prevent people from taking away God's money. Thus, he lives his life with the desire to prevent ruthless telemarketers who would prey upon innocent people under the auspices of raising money for charities but would be pocketing most of the money instead.

The victims in this case were only put out a small amount of money, though admittedly it is larger in the aggregate. From the testimony at trial, it appeared that some of them did not even have monetary losses, as they contacted the banks, and the matter was then resolved when they were reimbursed. This was not a major fraudulent scheme for the purpose of enriching Mr. Trankle, and proof of that was the spartan lifestyle Mr. Trankle lived during this time and even up to the time of his arrest.

What is significant, though, is that Mr. Trankle was committed to his efforts. As the saying goes, the proof is in the pudding, and it is clear that Mr. Trankle was working tirelessly to accomplish his church's mission. He had

---

4 Jesus entered the temple courts and drove out all who were buying and selling there. He overturned the tables of the money changers and the benches of those selling doves. Matthew 21:12 (NIV).

multiple ways of attempting to help consumers from telemarking fraud. For example, he would send his Police Crimeline publications regularly regarding his investigations to congressmen, state attorneys general, and many others so that the authorities would go after these people. A copy of one of the Police Crimeline is attached hereto and incorporated herein as Exhibit B. He wrote a book, "What the Fundraisers Say" which provided people warnings and information about how telemarketers were taking money from the charities who need it. Copies of the book were available for purchase, and a copy of the book for sale on Amazon is attached hereto as Exhibit C and incorporated herein. Furthermore, he would provide information. He would provide reviews of charities and their legitimacy via his website restaurantbuyersclub.com. A copy of one such review is attached hereto as Exhibit D and incorporated herein. He also created a website which allowed people to report numbers online to see what telephone numbers from which telemarketers were calling. He also would reach out personally to individuals to assist in investigations, which, for example, included assistance by reaching out to the Ohio Attorney General in the Bobby Thompson investigation and eventual conviction. See "Man who bilked millions in Navy charity scam gets 28 years," Dec. 16, 2013, located at https://www.cnn.com/2013/12/16/justice/ohio-navy-charity-sam/index.html

## 2. Defendant's History and Characteristics

James Trankle is a 56-year-old man who is an ordained minister. He owns no home, has no property, has no monetary savings, and does even own a vehicle with the exception of a bicycle that was found in the office from where did his mission work for Good Charity Church . Besides being the headquarters for his church, it was also where Mr. Trankle lived.

Mr. Trankle's life was driven by his mission work.   His life's work for many years has been his missional church and is the driving force with which he has devoted his life. Indeed, the sole mission of the church is to prevent people from being taken advantage of by telemarketers who claim that donations to charities are almost entirely pocketed by the telemarketers. He came to this point after having been working in the telemarketing field and rejecting its questionable practices. He had an epiphany and began devoting his work and his life to preventing citizens from having their money intended for godly, charitable purposes end up in the pockets of telemarketers who were searching only for profit.

Mr. Trankle was adopted, and his parents are now deceased. His father was a veteran who served in the U.S. Navy and his mother passed away when he was four years old. This is why the foundations that he worked as part of his

church, including his $3831 donation to Walter Reed Society as presented in trial, included helping veterans as well as those with breast cancer. He is single and does not have any children. He has been homeless for the past 20 years, often living in a tent. He does not currently drink or use drugs. He took computer classes from Purdue University but had to stop his studies due to a serious work-related knee injury.

Mr. Trankle began his mission work to go after telemarketers from having worked in the business and realized how telemarketers took advantage of people by pocketing most of the money and providing a tiny portion to those charities that needed it. He felt so strongly about it that he created he devoted his life to God and created his missional church whose sole mission is to protect God's money. He has taken, as part of his avocation, a vow of poverty, which explains his lack of personal assets and his voluntary homelessness. He would conduct research and investigation and provide it to the authorities and anyone who would listen. He would not take a salary, and would make money from advertisements, mostly from restaurants, in his publications. He has filed for bankruptcy twice in his life as well.

The government has sought to paint Mr. Trankle as an individual who is enriching himself through the efforts of the actions of which Mr. Trankle has

been convicted. However, the government fails to acknowledge any of the work that Mr. Trankle has done as part of his church. He has chosen to live a difficult lifestyle in order to pursue his efforts to stop telemarketers. Though the jury may have thought that he committed fraud through his mailings, all the money received went right back into his church's efforts to stop the abuse by telemarketers. He spent every day working, researching, and writing, ceaselessly spending his hours to promote his church's mission: to protect God's money. As the attached exhibits demonstrate, he has devoted hundreds if not thousands of hours into this investigational mission work.

In summary, Mr. Trankle is a man living as simple lifestyle as he can while working on his mission. He has nothing tangible to show for his efforts other than the many writings, websites, and podcasts he has done for his mission. While the jury may have found his methods to do his missional work to have been improper, his goal was to simply to help support the "general welfare" of his church and the laudable goals of stopping those telemarketers who sought to profit from their greedy endeavors and attempting that money got to those who truly needed it.

### 3. Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

Mr. Trankle has spent the last 17 months in jail because of these charges. This time has taught him respect for the law and encouraged him to pursue his mission goals by other means. It has been considerable punishment having his liberty taken away, particularly when he has had to deal with being imprisoned during the time of the pandemic. Provided that Mr. Trankle proceeds with other options for raising his funds for his church, the public need not fear Mr. Trankle in any way.

However, to be clear, Mr. Trankle, upon his release, intends to continue with the work and mission of his church. He will continue to go after telemarketers, as that is what God has called him to do. He will still continue with his vow of poverty and focus his time and money to accomplish these goals. The difference now is that Mr. Trankle will work to make sure that his efforts to raise money to pursue his mission are done in a lawful manner.

It should be noted that Mr. Trankle had sought to conduct his efforts within the law. Mr. Trankle, in his training, has attempted to follow the law to assure that his efforts did not run afoul of the law. He has studied a considerable amount of case law to ensure that his efforts ran above board. For instance, Mr. Trankle

attempted to follow what was allowable and not allowable by following cases such as Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600 (2003). He would use language and verbiage from other charitable 501(c)(3) organizations in his letters to make sure he was properly making solicitations that were appropriate. His solicitation was attempting to use a marketing technique which had a negative option feature. This marketing technique allows for a company to set up an agreement to provide an ongoing good or service with someone, such as a recurring payment, until such time the person affirmatively cancels the agreement. Perhaps one of the more well-known negative option feature techniques was used many years ago by the music company Columbia House. Columbia House would send you a new record until such time that you affirmatively cancelled it.   This is a permissible, lawful marketing technique, but it requires many disclosures. See 16 CFR § 310.3.

While admittedly it appears that the jury determined that he crossed the line, Mr. Trankle was trying to follow the law and respect its limitations. Obviously, Mr. Trankle has learned his lesson and will be more careful in the future. However,   will continue his efforts to expose the corruption of the telemarketing industry, though he plans to adjust his fundraising efforts in the future in order to avoid a situation such as the one he finds himself in right now. Mr. Trankle

respectfully submits that it his First Amendment right to practice his religion and his church efforts, and the way God has called him is to protect God's money from unscrupulous individuals in the telemarketing business. If Mr. Trankle was indeed doing this for his own financial expansion, he would not be homeless and have more than a bicycle to his name.

### 4.    Need to Avoid Unwarranted Sentencing Disparities

The court undoubtedly wishes to avoid disparities between the defendants from similarly situated clients. According to the PSR, Mr. Trankle is looking at a prison range of 57 to 71 months, based upon a Criminal History of I and an offense level of 25. As discussed above, Mr. Trankle believes that even if the court rejects all his objections to the level increases, he is still entitled to the zero-point offender reduction under 4C1.1, which would put him at 23, or 46-57 months.

According to the information provided in the PSR in ¶ 121, the average length of imprisonment for someone with this criminal history and level was fifty-one (51) months, and the median length was forty-eight (48) months. Mr. Trankle at this time has been detained since July 12, 2022, making his current time in jail almost seventeen (17) months. There appears, therefore, to be a considerable amount of sentencing below the sentencing guideline range at this level. For the reasons argued above, it is the defense's belief that the guideline range should be

much lower than that calculated. Accordingly, the defense would ask for the court to consider going below the guideline range in this matter as well, regardless of the final guideline range determination once it takes the factor under 18 U.S.C. § 3553(a) in consideration.

Mr. Trankle's goal of challenging charity fraud through telemarketers is a laudable one, as he is trying to combat the efforts of alleged charities trying to have telemarketers profit while providing little to no support to the underlying organization. What this case essentially boils down to is the issue of how Mr. Trankle achieved and financially supported those efforts. He has paid a sufficient cost with his liberty, and he would ask for the court's mercy for his actions. Accordingly, the defense would respectfully suggest, after taking consideration of all the factors under § 3553(e), that a sentence of twenty (20) months is an appropriate sentence.

WHEREFORE, for these many reasons described above, Mr. Trankle would respectfully ask for a sentence of twenty (20) months as to each count, with all counts to run concurrently, and a supervised release sentence of no more than the statutory maximum of three (3) years.

Respectfully submitted,

JAMES TRANKLE


   /s/John L. Machado   
John L. Machado, Esq.
Bar Number 449961
Attorney for James Trankle
Law Office of John Machado
503 D Street NW, Suite 310
Washington, D.C. 20001
Telephone (703)989-0840
Email: johnlmachado@gmail.com


**Certificate of Service**

I hereby certify that a true copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system this 29th day of November, 2023, which will send a notification of such filing (NEF) to the following to all counsel of record.


   /s/John L. Machado   
John L. Machado, Esq.
Bar Number 449961
Attorney for James Trankle
Law Office of John Machado
503 D Street NW, Suite 310
Washington, D.C. 20001
Telephone (703)989-0840
Email: johnlmachado@gmail.com

27